UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| DYLAN BURKE | : | |
| Debtor | : | Bankruptcy No. 08-11654bf |
| _____ | | |
| CLARANNE SANDOW | : | |
| Plaintiff | : | |
| v. | : | |
| DYLAN BURKE | : | |
| Defendant | : | Adversary No. 08-0135 |

...............................................

MEMORANDUM

...............................................

In the instant adversary proceeding, the plaintiff, Mrs. Claranne Sandow, asserts that the defendant, Mr. Dylan Burke, owes her a nondischargeable debt pursuant to 11 U.S.C. §523(a)(4) and (a)(6). The defendant denies that any claim held by the plaintiff is nondischargeable under those statutory provisions.

As will be discussed below, Mrs. Sandow contends that the two parties entered into an agreement wherein she sold her residence to Mr. Burke in exchange for both monetary consideration as well as an oral agreement for the creation of a life estate in the property in her favor. Mrs. Sandow asserts that in failing to honor this oral agreement Mr. Burke obtained a substantial economic benefit to her detriment by way of either willful and malicious conduct or through larcenous behavior, both of which are grounds for nondischargeability in this chapter 7 bankruptcy case.

As a preliminary matter, the parties agree that there was a state court default judgment in the amount of $55,600 entered in favor of the plaintiff and against the defendant. Thus, the only issue posed by this proceeding is whether the claim represented by this judgment is nondischargable. Furthermore, the parties agree that neither claim preclusion (res judicata) nor issue preclusion (collateral estoppel) is applicable.[1]

I.

After trial in this proceeding, and upon consideration of all the testimony and exhibits offered into evidence, as well as upon the parties' pretrial statement of uncontested facts and jointly offered Statements of Admissions, I make the following factual findings:[2]

---

[1] Claim preclusion (res judicata) from pre-bankruptcy state court litigation does not apply to dischargeability disputes under section 523(a). See In re Graham, 973 F.2d 1089, 1095-96 (3d Cir. 1992). Moreover, in order for issue preclusion (collateral estoppel) to arise, the following elements must be proven:

> (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

Id., at 1097 (citing In re Braen, 900 F.2d 621, 628-29 n. 5 (3d Cir. 1990)). Pennsylvania state court default judgments do not give rise to section 523 issue preclusion since issues are not actually litigated. See, e.g., Matter of McMillan, 579 F.2d 289 (3d Cir. 1978); In re Kartman, 391 B.R. 281, 283 (Bankr. W.D. Pa. 2008); see also In re Graves, 33 F.3d 242, 248 (3d Cir. 1994) ("[D]efault judgments are not given preclusive effect in Pennsylvania's courts.").

[2] Reference to the Notes of Testimony ("N.T.") shall include the precise time of day that the testimony was given, as noted on the audio disc. Neither party ordered a transcript of the trial.

2

1. The chapter 7 debtor and defendant in this adversary proceeding is Mr. Dylan Burke, who filed a voluntary petition on March 11, 2008, and who resides in Jenkintown, Pennsylvania.  Ex. J-1 (Statement of Admissions, #3).

2. The plaintiff is Mrs. Claranne Sandow, an individual residing at 13 Williams Lane, Hatboro, Montgomery County, Pennsylvania.  Id., #1.

3. Prior to October 2002, Mrs. Sandow held title to the Hatboro property and resided therein with members of her family.  N.T. 9:40:40-9:40:50.  Mr. Burke, who was romantically involved with Mrs. Sandow's adult daughter, also resided at the Hatboro property since approximately 1999.[3]  N.T. 9:41:25-9:41:32; ex. J-1 (Statement of Admissions, ##7, 8).

4. Prior to October 2002, Mrs. Sandow borrowed approximately $50,000, secured by a mortgage on the Hatboro realty.  She intended to use the proceeds of this loan to build an "in-law suite" for use by her father.  N.T. 9:42:00-9:42:14.

5. By October 2002, Mrs. Sandow was delinquent in mortgage payments and fearful of losing her home in foreclosure.  N.T. 9:42:30-9:42:45.

6. To prevent such a foreclosure, Mrs. Sandow proposed to Mr. Burke that he purchase the Hatboro realty.  N.T. 9:42:45-9:42:55.  Mr. Burke, who was employed, agreed to this proposal.  However, after investigation, he concluded that he would qualify for no more than $100,000 of secured financing.  Ex. J-1 (Statement of Admissions, #15).

---

[3]Defendant testified that he was engaged to Plaintiff's adult daughter. N.T. 10:30:45-10:31:00.  Further, Plaintiff testified that defendant was "like a son-in-law" and was otherwise "part of the family." N.T. 9:52:05-9:52:25.

3

7. The parties agree that, as of the time of the sale of the property to Mr. Burke, the Hatboro realty had a fair market value of approximately $190,000. N.T. 10:32:00-10:32:30.

8. Mrs. Sandow and Mr. Burke initialed a form agreement of sale dated October 8, 2002. Ex. D-1. The purchase price of the Hatboro property was listed as $190,000, but the buyer was to tender only $100,000 in cash. The balance, $90,000, was identified in the agreement as "seller gift of equity to buyer (family member)." Id.; see also ex. J-1 (Statement of Admissions, #6).

9. On November 1, 2002, Mrs. Sandow transferred title to the Hatboro realty to Mr. Burke. Ex. J-1 (Statement of Admissions, #4). The latter paid Mrs. Sandow $100,000, from which (after deduction of certain closing costs) her mortgage obligation was repaid in full and she received $42,438.36 in cash. Ex. J-1 (ex. P-2). Consistent with the agreement of sale, the settlement sheet signed by Mrs. Sandow and by Mr. Burke lists the sale price of the realty as $190,000, with $90,000 of that price represented by a "gift of equity." Id.

10. Mrs. Sandow testified that this $90,000 "gift" was actually in exchange for Mr. Burke's promise to permit plaintiff to live in the Hatboro realty for the rest of her life.[4] Mr. Burke denied making any such promise and testified that the price was listed as $190,000, rather than $100,000, due to concerns held by Mrs. Sandow involving creditors

---

[4] Although the complaint, at ¶11, makes reference to a promised life estate, in her testimony, Mrs. Sandow testified that the understanding between the parties was that she "would always have a place to live." N.T 9:50:30-9:50:45.

4

of her father's estate. N.T. 10:32:45-10:32:54.[5] No document was ever created purporting to grant a life estate to Mrs. Sandow by Mr. Burke, nor creating any other interest in the Hatboro realty. N.T. 9:51:05-9:51:20.

11. Mr. Burke testified credibly of his intention in November 2002 that he, along with Mrs. Sandow, her daughter and grandson, would continue to live at the Hatboro property as a family, and that he would provide financial support to this household including payment of the mortgage loan he executed. N.T. 10:33:05-10:33:20. He also intended to renovate and ultimately sell the Hatboro residence and then move to a more attractive home with Mrs. Sandow and her family. N.T. 10:38:20-10:38:46.

12. After November 1, 2002, Mr. Burke continued to reside in the Hatboro realty with Mrs. Sandow, her daughter and grandson, although Mr. Burke and Mrs. Sandow's daughter never married. Ex. J-1 (Statement of Admissions, ##7, 8).

13. Mr. Burke credibly testified, without rebuttal, that after November 1, 2002, he provided the primary financial support to the residents of the household, including payment of the new mortgage. N.T. 10:33:30-10:34:18.

14. In July 2003, while still residing at the Hatboro realty, Mr. Burke refinanced the mortgage on the property by borrowing the sum of $132,500; he also took out a second mortgage in the amount of $35,000. Ex. J-1 (Statement of Admissions, ##9,

---

[5]The "gift of equity" phrase was suggested by a real estate agent, Ruth Campbell, who was Mrs. Sandow's friend. Ms. Campbell testified that she hoped the phrase would, in some fashion, support Mrs. Sandow's understanding of her continuing right to occupy the Hatboro residence after its sale. She did not testify, however, that Mr. Burke made any representations to her or that she had discussed this matter with him. N.T. 10:21:15-10:23:00. Ms. Campbell was not present at the real estate closing. N.T. 10:24:29-10:23:33.

5

10).  Some of the proceeds of these loans were used by Mr. Burke for his own personal benefit.  Some of the proceeds were used to begin renovations of the Hatboro realty.  N.T. 10:37:55-10:38:30; 10:54:00-10:55:28.  Some of the proceeds were used for the benefit of Mrs. Sandow's daughter.  N.T. 10:40:15-10:40:57.  The net proceeds from these two loans totaled about $57,000.

15. Mr. Burke continued to reside at the Hatboro realty along with Mrs. Sandow and her other family members until approximately July 30, 2004.  Ex. J-1 (Statement of Admissions, #11).

16. On or about July 30, 2004, Mr. Burke vacated the Hatboro residence owing to the cessation of his relationship with Mrs. Sandow's daughter, who became romantically involved with another person and, Mr. Burke believes, ultimately married that other individual.  N.T. 10:35:30-10:35:35; 10:36:50-10:36:55; ex. J-1 (Statement of Admissions, #11).  After Mr. Burke left the residence, Mrs. Sandow, her daughter and grandson, along with Mrs. Sandow's mother, continued to live in the Hatboro realty.  Ex. J-1 (Statement of Admissions, #8).

17. In January 2005, Mr. Burke sent a written demand to Mrs. Sandow that she begin tendering monthly payments to him in the amount equal to the amount of the monthly mortgage payments (including escrows for taxes and insurance): $1700.  See ex. J-1 (Statement of Admissions, ##12, 18).

18. Mr. Burke made the monthly mortgage payments from July 2004 through January 2005, even though he was not living at the property at that time.  N.T. 10:49:02-10:49:06.

6

19. Mrs. Sandow tendered payments to Mr. Burke in the amount of $1,700 per month from January 2005 through October, 2007. Ex. J-1 (Statement of Admissions, #12); Pretrial Statement of Uncontested Facts, at 2. Upon receipt, Mr. Burke made the corresponding monthly mortgage payments. N.T. 10:49:24-10:49:54. The parties characterize the $1,700 monthly payments from the plaintiff to the defendant as rent payments, although there was no written lease agreement between the parties. Ex. J-1 (Statement of Admissions, #16).

20. In June 2006, Mr. Burke refinanced the two July 2003 mortgages on the Hatboro realty by borrowing $184,300. Ex. J-1 (Statement of Admissions, #24). In addition to using these loan proceeds to satisfy the two previous mortgages, Mr. Burke received approximately $6,700 in cash proceeds from this transaction. N.T. 10:58.

21. Soon after he vacated the Hatboro residence, Mr. Burke proposed to Mrs. Sandow that the property be sold to a third party, with the sale price being used to satisfy the outstanding mortgages and the net proceeds payable to her. N.T. 10:47:05-10:47:30. This proposal was not accepted. N.T. 10:47:39-10:47:45.

22. In October or November 2004, Mr. Burke offered to sell the realty to Mrs. Sandow's daughter for the exact amount that he owed on the outstanding mortgages. N.T. 10:47:30-10:48:34. Mr. Burke credibly testified that this offer was initially accepted, but that Mrs. Sandow's daughter never purchased the realty from him. N.T. 10:48:39-10:48:47.

23. In October or November of 2007, Mr. Burke decided that he did not wish to continue the lessor/lessee relationship with Mrs. Sandow and her family, and decide to seek a purchaser for the Hatboro realty. N.T. 11:00:30-11:00:58. He listed the

Hatboro realty for sale with a real estate agent in November, 2007. Pretrial Statement of Uncontested Facts, at 2.

24. In November 2007, Mr. Burke sent an undated letter to Mrs. Sandow informing her that he had the listed the Hatboro property for sale with a real estate agent and that Mrs. Sandow and her family could remain in the premises so long as they continued to tender rent payments and cooperated with the real estate agent. Ex. J-1 (ex. P-3); Pretrial Statement of Uncontested Facts, at 2.

25. Beginning November 2007, Mrs. Sandow ceased tendering monthly payments to Mr. Burke. By letter dated January 7, 2008, Mr. Burke authorized an attorney to send to Mrs. Sandow a notice to vacate the residence due to non-payment of rent. Ex. J-1 (ex. P-4).

26. When Mrs. Sandow ceased tendering payments to Mr. Burke, the latter ceased tendering mortgage payments. A mortgage foreclosure action was filed in December 2007, and judgment by default was ultimately entered in an amount exceeding $200,000. Pretrial Statement of Uncontested Facts, at 2.[6]

27. In December, 2007, Mrs. Sandow commenced a civil action against Mr. Burke in the Montgomery County Court of Common Pleas. On January 29, 2008, a default judgment was entered against the defendant on Count II of the state court

---

[6]This judgment amount likely would include the mortgagee's costs and counsel fees.

complaint, which count sought damages in the amount of the monthly payments made by Mrs. Sandow, totaling $55,600. Ex. J-1 (Statement of Admissions, ##19, 20, 21).[7]

II.

Based upon the evidence presented, I reach the following legal conclusions:

1. The plaintiff did not meet her evidentiary burden to prove that any debt owed to her by the debtor should be held nondischargeable under section 523(a)(4).

2. The plaintiff did not meet her evidentiary burden to prove that any debt owed to her by the debtor should be held nondischargeable under section 523(a)(6).

III.

Plaintiff's primary argument for nondischargeability is based on 11 U.S.C. §523(a)(6). Section 523(a)(6) of the Bankruptcy Code provides:

> A discharge under section 727, 1131, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> 
> ***
> 
> (6) for willful and malicious injury by the debtor by another entity or to the property of another entity.

---

[7]Although a copy of the complaint was not admitted into evidence, it appears from the arguments of counsel that Count II of the complaint sought relief on the basis of unjust enrichment. I also note that monthly payments of $1,700 from January 2005 until October 2007 would total $57,800 and not $55,600.

9

A plaintiff must establish nondischargeability under section 523(a)(6) by a preponderance of the evidence.  See, e.g., In re Keaty, 397 F.3d 264, 270 (5th Cir. 2005); In re Scarborough, 171 F.3d 638, 641 (8th Cir. 1999); In re Antonious, 358 B.R. 172, 186 (Bankr. E.D. Pa. 2006); see generally Grogan v. Garner, 498 U.S. 279, 291 (1991). Courts have concluded that, after passage of the 1978 Bankruptcy Code, Congress intended that section 523(a)(6) have a higher standard than mere recklessness.  See In re Conte, 33 F.3d 303, 306 (3d Cir. 1994); In re Antonious, 358 B.R. at 186.  The Supreme Court has narrowly defined the phrase "willful and malicious" as used in section 523(a)(6) as limited in scope to intentional torts.  Kawaauhau v. Geiger, 523 U.S. 57 (1998).  Thus:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." . . . Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, comment a, p. 15 (1964) (emphasis added).

Geiger, 523 U.S. at 61-62; see also In re Markowitz, 190 F.3d 455, 464 (6th Cir.1999).

Further, the Third Circuit Court of Appeals has instructed:

> [W]hen Congress required more than recklessness for nondischargeability, it required that the debtor [had] engaged in conduct more culpable than taking a deliberate action that had a high probability of producing harm . . . .  Rather, for the injury to have been "willed" by the debtor, it must at least have been substantially certain to result from the debtor's act.

In re Conte, 33 F.3d at 307.

10

Under the instructions established by the Supreme Court and the Third Circuit, the test for whether an injury is willful and malicious for purposes of section 523(a)(6) nondischargeability is whether "the actor purposefully inflicted the injury or acted with substantial certainty that injury would result." In re Conte, 33 F.3d at 305; see, e.g., In re Antonious, 358 B.R. at 187. Applying this standard, I conclude that Mrs. Sandow failed to prove that the actions of Mr. Burke that gave rise to Mrs. Sandow's state court judgment against him were willful and malicious.

First, the state court judgment awarded damages roughly equal to the rent payments tendered to Mr. Burke from January 2005 through October 2007. To prove that this debt is nondischargeable under section 523(a)(6), Mrs. Sandow needed to establish that Mr. Burke's demand for payment of rent constituted a purposely inflicted injury, or was an action taken with substantial certainty that injury would result.

The evidence at trial demonstrated that Mr. Burke purchased the realty from Mrs. Sandow in November 2002 to protect the property from foreclosure, and thereafter he paid the refinanced mortgage obligations without assistance from her until January 2005. He left the Hatboro premises in July 2004 when Mrs. Sandow's daughter ended their relationship. Five months later, he demanded rent payments equal only to the amount of the monthly mortgage payments. He then used the rent payments to pay his mortgage obligation.[8] Whether he had a legal right to demand such payments may be debated by the parties. But since Mrs. Sandow and her family were occupants of the property and Mr. Burke was not, it was not willful or malicious that he should insist that

---

[8] Had he not done so, a foreclosure action would have been filed before December 2007.

11

the occupants pay the mortgage debt. Indeed, apparently Mrs. Sandow thought the demand was appropriate since she complied with his request for almost two years.

Further lack of willfulness and malice is demonstrated by Mr. Burke's failure to demand compensation before January 2005, although he had vacated the residence months earlier. Had Mr. Burke intended to injure Mrs. Sandow, he would have acted immediately.

Second, to the extent that Mrs. Sandow is attempting to convert a breach of an agreement for a life estate into an intentional tort, but see Hanna v. Sarris 2003 WL 24163522, at *4 (C.P. Bucks Co. 2003) (dispute involving sale of real estate did not state any claims in tort), it is at least problematic that a life estate was created. Clearly, such an interest was never memorialized in writing, as required by Pennsylvania's Statute of Frauds. See 33 P.S. § 1. Specifically, "the statute of frauds provides that all estate, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands tenements, or hereditaments will have the force and effect of estates at will only, unless put in writing and signed by the parties so making or creating the same, or their agents." 16 Summ. Pa. Jur. 2d Commercial Law § 1:67 (October, 2008). Accordingly, under Pennsylvania law, a life estate must be in writing to be enforceable. See Snyder v. Ziegler, 69 Pa. D. & C.2d 543, 545 (C.P. Montg. Co. 1974) ("The agreement may be characterized as a contract for the conveyance of a life estate— a freehold interest. As such, it is indeed controlled by the Statute of Frauds. . . ."). Clearly, a document referring only to a "gift of equity" does not constitute such a writing.

I appreciate that Pennsylvania law "has been construed as permitting recovery of damages for breach of an oral agreement to sell land." Fannin v. Cratty, 331

Pa. Super. 326, 334 (1984). Therefore, while the purported life estate here would not be specifically enforceable due to the statute of frauds, arguably, if Mrs. Sandow could prove the existence of an oral promise, state law may permit her to recover damages for the breach of such oral promise. A claim, however, for breach of an oral promise does not constitute an intentional tort and thus does not establish willful and malicious injury. See generally In re Riso, 978 F.2d 1151, 1154 (9th Cir. 1992) ("It is well settled that a simple breach of contract is not the type of injury addressed by § 523(a)(6)."); In re Jacobs, 381 B.R. 128, 138 (Bankr. E.D. Pa. 2008) ("[Section] 523(a)(6) is not intended to render nondischargeable debts arising from simple breaches of contract.").

In this adversary proceeding concerning nondischargeability, I need not determine whether Mr. Burke indeed promised Mrs. Sandow that she could live in the Hatboro realty without payment for the balance of her life, regardless of whether Mr. Burke continued to reside at the premises. I need only conclude that any claims arising from the breach of such a contested promise would not fall within the scope of section 523(a)(6).[9]

IV.

Alternatively, Mrs. Sandow seeks relief under 11 U.S.C. § 523(a)(4). Section 523(a)(4) provides for the nondischargeability of any debt "for fraud or

---

[9] Mrs. Sandow does not assert that Mr. Burke committed fraud giving rise to a nondischargeable claim under section 523(a)(2). Had she done so, the evidence presented would have been insufficient. See generally In re Hilley, 124 Fed. Appx. 81, 82 (3d Cir. 2005) (non-precedential); In re Naimo, 1995 WL 163598 (E.D. Pa. 1995).

defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). Although Mrs. Sandow's complaint states that she also bases her claim for nondischargeability upon a breach of Mr. Burke's fiduciary duty, at trial she focused on the issue of larceny.[10]

By virtue of Fed. R. Bankr. P. 7054, incorporating Fed. R. Bankr. P. 54(c), if the facts prove a claim for embezzlement rather than for larceny, relief under section 523(a)(4) may be warranted. See In re Salamone, 78 B.R. 74, 77 (Bankr. E.D. Pa. 1987). Both embezzlement and larceny, as used in section 523(a)(4), are to be determined with reference to federal common law. See In re Steele, 2005 WL 281154, at *3 (Bankr. E.D. Pa. 2005); In re Jardula, 122 B.R. 649, 653 (Bankr. E.D.N.Y. 1990).

> Embezzlement under § 523(a)(4) has been defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." In re Weber, 892 F.2d 534, 538 (7th Cir.1989) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)). To prove embezzlement, the Creditor must show that the debtor appropriated the subject funds for his own benefit and did so with fraudulent intent or deceit. Weber, 892 F.2d at 538. A fiduciary relationship or a trust relationship need not be established in order to find a debt nondischargeable by an act of embezzlement. Id. Larceny under § 523(a)(4) necessitates a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent. In re Rose, 934 F.2d 901, 903 (7th Cir.1991). Embezzlement differs from larceny only in that the original taking was lawful, or at least with the consent of the owner, unlike larceny, where there is a requirement that felonious intent exists at the time of the taking. Id.

---

[10]Indeed, she made no attempt to prove that a fiduciary relationship existed. One who grants a life estate is not considered a fiduciary. Conversely, one who is granted a life estate may have certain duties to prevent waste and destruction of the property. See generally In re Estate of Hewitt, 554 Pa. 486, 492 (1998).

14

In re House, 2007 WL 2126260, at *4 (Bankr. N.D. Ill. 2007); see also In re Salamone, 78 B.R. at 77.  Both larceny and embezzlement involve fraudulent misappropriation of property, but at different times:

> In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

4 Collier on Bankruptcy, ¶ 523.10[2] (15th ed. rev. 2008).

As a commentator has similarly observed, "embezzlement, for purposes of 11 U.S.C.A. § 523(a)(4), is fraudulent appropriation of property of another by [a] person to whom such property has been entrusted or into whose hands it has lawfully come." Bankruptcy Services, L. Ed., § 27:913 (2008).  Therefore, to establish that a debt is nondischargeable owing to embezzlement, a creditor must "prove that Debtor received the [property] legally but subsequently misappropriated it for her own benefit with a fraudulent intent or to deceive." In re Steele, 2005 WL 281154, at *4.

Mrs. Sandow does not suggest that Mr. Burke obtained title to the Hatboro realty through larceny; nor does she contend that he embezzled the real property from her. She voluntarily conveyed the real estate to him in order to avoid mortgage foreclosure. Accordingly, as mentioned earlier, Mrs. Sandow appears to concentrate upon the validity of the rental payments made to Mr. Burke as they are the basis of her judgment against him.  Thus, I shall consider whether these payments were obtained by Mr. Burke either through means of larceny or embezzlement.

The evidence at trial established that Mr. Burke demanded that the plaintiff make rental payments beginning in January 2005, after he had vacated the realty, and in

the amount equal to the mortgage payments due on the Hatboro residence. For almost two years, the plaintiff acceded to this demand and made such payments. There was no evidence presented that would demonstrate that the rental payments were initially obtained through any kind of theft, fraud, or deception, as would be required for larceny.

As stated previously, the black letter test of embezzlement is "the fraudulent appropriation of property by a person into whose hands it has lawfully come." In re Steele, 2005 WL 281154, at *4. In this proceeding, Mr. Burke credibly testified that he originally agreed to purchase the realty from Mrs. Sandow as an accommodation: to preclude foreclosure and enable the Sandow family and Mr. Burke to continue living together in the Hatboro residence. He was viewed by Mrs. Sandow as a virtual son-in-law. The amount he paid for the realty was a function of his income and the amount he was able to borrow. Then, after conveyance, Mr. Burke paid the mortgage expense for slightly more than two years. He later refinanced his original mortgage, obtaining some cash proceeds. Those proceeds were used, in part, toward improving the realty property for the benefit of all of the occupants. He intended after completing these improvements to sell the realty and have all the Sandows move with him to a more attractive location.

Ultimately, Mr. Burke fell out of favor with Mrs. Sandow's daughter and moved out of the Hatboro residence. He continued to pay the mortgage for a few months thereafter and then demanded that the Sandows bear that burden, as he no longer lived there. He used their rent payments to pay his mortgage obligation. In those circumstances, Mrs. Sandow has not proven that either the demand for rent payments nor their use constitutes embezzlement.

Accordingly, Mrs. Sandow did not prove her claim under section 523(a)(4). See generally In re Belfry, 862 F.2d 661 (8th Cir. 1988); In re House, 2007 WL 2126260, at *6.

V.

Mrs. Sandow obtained a default judgment against Mr. Burke to recover payments made by her to him from January 2005 through October 2007, and characterized by the parties as rent. Whether this default judgment was based upon a claim of unjust enrichment or breach of an oral promise, sections 523(a)(4) and (a)(6) require that a creditor establish more than mere liability on such claims. Under the subsections of section 523(a) relied upon in this adversary proceeding, a claim is nondischargeable only if the plaintiff can prove that the claim arose from a willful and malicious injury, or from larceny or embezzlement. For the reasons stated above, Mrs. Sandow only demonstrated that her claim was based upon a disputed understanding of her right of free, lifetime occupancy upon the transfer of title to her residence. As such a claim is outside the scope of subsections 523(a)(4) and (a)(6), Mr. Burke's debt to her is dischargeable.

An appropriate order shall be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: March 6, 2009.

17